**E-FILED**

Wednesday, 12 October, 2005  11:08:02 AM

Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHALE A. CALLAHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 03-2167 |
| v. ) | |
| ) | |
| CHARLES E. BRUEGGEMANN, ) | |
| DIANE CARPER, AND STEPHEN M. ) | |
| FERMON, ) | |
| ) | |
| Defendants. ) | |

<u>ORDER ON PENDING POST TRIAL MOTIONS</u>

After a two-week trial, a jury found in favor of the plaintiff, Michale A. Callahan, ("Callahan") and against the defendants, Diane Carper ("Carper") and Stephen M. Fermon ("Fermon"), awarding compensatory damages of $210,000, and assessing punitive damages of $195,600 against Carper and $276,700 against Fermon.  The jury found in favor of defendant Charles E. Brueggemann ("Brueggemann").

Now before the court are the following post-trial motions: Fermon's motion for judgment as a matter of law [#101] and motion for a new trial or, in the alternative, a motion to alter or amend judgment [#103]; Carper's motion for a new trial or, in the alternative, a motion to alter or amend judgment [#104] and motion for judgment as a matter of law [#106]; Callahan's motion for attorney fees and costs [#108]; and Brueggemann's motion for a bill of costs [#117].

I.

On a motion for judgment as a matter of law, the court does not re-weigh the evidence presented or make credibility determinations.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The court simply determines whether the evidence presented at trial was legally sufficient to support the jury's verdict. *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000).

Fermon and Carper argue for judgment as a matter of law because Callahan's speech was not protected by the First Amendment.  They contend that Callahan did not speak on a matter of public concern, and the Illinois State Police's ("ISP") interests outweighed Callahan's right to speak.  The parties raised the public concern argument on summary judgment; this court rejected the argument, as did the Seventh Circuit Court of Appeals when it ruled on the defendants' last-minute attempt to postpone trial.  The court sees no need to revisit this issue.[1]

---

[1] It seems indisputable to the court that Callahan's speech was protected by the First Amendment.  Consider Justice White's observation in *Connick v. Myers,* 461 U.S. 138, 148 (1983)

The defendants continue to argue that Callahan's right to speak was outweighed by the ISP's interest as an employer in ending an adversarial work environment in Zone 5, citing *Pickering v. Board of Educ.*, 391 U.S. 563 (1968).  However, the defendants presented no evidence that Callahan's protected speech caused the adversarial work environment.  The defendants argued that an EEO investigation motivated their decision to transfer Callahan.  But ISP officials were told they could not rely on the results of the investigation because the investigation was ongoing.  Furthermore, the EEO investigation results were not reduced to writing until several months after Callahan was transferred, in what the jury may have considered an after-the-fact attempt to justify the transfer.[2]  There was no evidence before the jury to indicate that Callahan's speech disrupted the work environment in Zone 5.[3]  Thus, there was no need for the *Pickering* analysis at trial, and it is equally out of place on a motion for judgment as a matter of law.

The defendants also argue that there was no evidence of a causal relationship between Callahan's protected speech and his transfer.  The temporal proximity speaks volumes.  Callahan met with Department of Internal Investigations (DII) officials in April and early May 2003.  Fermon wrote a very detailed memo criticizing Callahan's work performance in early-to-mid May; Carper saw the letter when she returned from vacation about a week after that; and the decision to transfer Callahan was made shortly thereafter.[4]  That the ISP violated DII protocol by bringing Carper into its investigation despite the fact that Callahan had raised allegations about her conduct strengthened the causal connection.

The defendants assert that they are entitled to qualified immunity because it was not well established that a lateral transfer with no loss of pay or benefits constitutes retaliation.  However, the defendants are career ISP officers who must be aware that, among the officers, investigations work is viewed as a more prestigious assignment than patrol. Major Edie Casella stated as much.  Callahan had worked in investigations for years, coordinating with local, state and federal law enforcement agencies and task forces, whereas his assignment in patrol required that he spend his time on more

---

(public employee's speech not protected) as to what would have changed the outcome of that case. "Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases.  Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others."

[2] The court's function is not to second-guess what the jury might have thought of the EEO report issued so many months later.  It is enough to note that there was evidence to support a good dose of juror skepticism.

[3] The defendants attempted to have Pat Callahan testify that the plaintiff had been creating problems in Zone 5 by telling people about his DII report against Fermon and Carper.  The court ruled Pat Callahan's testimony to be inadmissible hearsay.   Pat Callahan's source of information, Sue Voges, testified by deposition.  Nothing in her deposition supported the assertion that the plaintiff told people in Zone 5 about his DII report.

[4] Fermon argues that the jury verdict in favor of Brueggemann shows Callahan would have been transferred regardless of his speech.  This is Fermon's speculation, with which the court disagrees.

mundane and less challenging tasks such as traffic violations.  Callahan testified he felt demoralized by the transfer.  It stretches the imagination to argue that a transfer from investigations to patrol would not be considered retaliatory, especially when Carper knew that Callahan did not want a patrol position.

The motions for judgment as a matter of law [#101, #106] are denied in their entirety.

II.

Fermon and Carper have also filed motions for a new trial, or in the alternative, motions to alter or amend judgment.

A.

On a motion for new trial, the court must determine whether the verdict is against the manifest weight of the evidence.  *Sokol Crystal Prods., Inc. v. DSC Comm. Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994).  The defendants argue that the jury's decision was not supported by the evidence.  However, the jury is entitled to weigh conflicting evidence as it sees fit and draw inferences from all the testimony and exhibits.  *Littlefield v. McGuffey*, 954 F.2d 1337, 1348 (7th Cir. 1992) ("The jury is the trier of fact – charged with determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences.").  The plaintiff offered significant, highly persuasive evidence in his favor.  That the defendants presented conflicting evidence does not require a new trial.  The jury was in the best position to determine the credibility of the witnesses and obviously found the plaintiff's evidence more persuasive.  The court has carefully considered the defendants' arguments and finds them unavailing.[5]

One of the defendants' arguments, with which the court disagrees, warrants particular note.  Carper argues that "Brueggemann testified (and the jury must have believed him to find in his favor) . . . ."  There is no indication that the jury believed every aspect of Brueggemann's testimony; the verdict simply reflects that the jury found the evidence insufficient to justify a finding against him.[6]

---

[5] Fermon argues in his motion for new trial that the testimony of Pat Callahan and Dave Lenartowicz was wrongly excluded.  The court has already addressed the argument as to Pat Callahan. Dave Lenartowicz's testimony would have suggested that the plaintiff was wrong about the existence of a DEA overhear.  The issue, however, is not whether the plaintiff was right or wrong, but whether he believed that Fermon had compromised a federal investigation, a belief that witnesses Greg Dixon and Nate Williams apparently shared.  Moreover, Lenartowicz was not listed in the defendants' witness list in the pretrial order and the compromise of the overhear was known to the parties as a relevant fact in the case.

[6] Brueggemann stated that he recommended Callahan's transfer based on what EEO officer Suzanne Bond told him.  The jurors may have concluded from all the evidence that Fermon and Carper were the driving force behind the transfer and Brueggemann simply relied on the excuses *they* – and not Bond – gave him.  The jury might also have believed that Bond was contacted to corroborate a set of facts that Fermon and Carper had already assembled to justify the transfer.

3

B.

Where jury instructions do not adequately state the law, resulting in prejudice to the movant, a new trial must be held.  *Susan Wakeen Doll Co., Inc. v. Ashton-Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001).  Where "considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law," a new trial is warranted.  *Susan Wakeen Doll Co.*, 272 F.3d at 452.

The defendants' arguments primarily revolve around the *Mt. Healthy* defense and the *Pickering* balancing test.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Pickering*, 391 U.S. 563.

1. <em>Mt. Healthy</em> defense

The defendants argue that the court erred in instructing the jury to determine whether "*the defendant under consideration* would have caused Callahan's reassignment even if he had not spoken on what he perceived as an actual or potential wrongdoing . . . and everything else stayed the same."  The error, argue the defendants, is that the instruction led the jury to conclude that Carper could be held liable even if Brueggemann would have made the decision anyway.  The defendants cite *Stagman v. Ryan*, 176 F.3d 986, 1002-03 (7th Cir. 1999) to support their argument that since Callahan's transfer would have occurred regardless of the protected speech, none of the defendants can be held liable.  However, the evidence did not conclusively establish that Callahan would have been transferred regardless of his speech.  It is obvious that the jury drew the opposite conclusion.

The jury heard evidence that after Callahan implicated both Fermon and Carper in his DII report, Fermon wrote a letter to Carper criticizing Callahan's work, and Carper discussed Callahan's job performance with Brueggemann.  Bond did not compile her summary of interviews until almost half a year later, several weeks after Callahan filed his lawsuit.  The jury was entitled to draw the reasonable inference that Bond wrote the summary of interviews so as to justify the transfer.   The jury apparently viewed the EEO report[7] with skepticism; instead, the jurors concluded from all the evidence that Fermon and Carper retaliated against Callahan for speaking out to DII.

2. <em>Pickering</em> Balancing Test

The *Pickering* test requires that an employer's interest in maintaining an effective work environment be balanced against the employee's interest in speaking out.  *Pickering*, 391 U.S. at 568.  The defendants continue to argue that, contrary to the Seventh Circuit's opinion in this case, the court erred by failing to give the *Pickering* instructions and special interrogatories.  At summary judgment, the defendants argued that the *Pickering* factors were relevant to this case; however, they failed to present sufficient evidence at trial to show that the disruptive work environment in Zone 5 had

---

[7] Carper and Fermon did not initiate the request for the EEO investigation.  The investigation was begun when ISP officials learned of an alleged hostile work environment in Zone 5 – a situation unrelated to the ISP's concerns about Callahan.  In fact, the hostile environment related to allegations against Fermon, not Callahan.  The jury may have concluded that the EEO investigation was commandeered as a way to justify the transfer.

4

anything to do with Callahan's protected speech.  This makes the *Pickering* analysis inapplicable.

3.  Speech in reckless disregard of the truth

Fermon argues that the court erred in instructing the jury that "freedom of speech does not extend to speech . . . that [is] deliberately false or malicious" when the correct standard is speech that is  "knowingly false or in reckless disregard for the truth," citing *Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir. 1994).  When taken as a whole, the applicable principles of law were adequately communicated to the jury; a new trial is not warranted.[8]  *Susan Wakeen Doll Co.*, 272 F.3d at 452.

The court has carefully considered each of the remaining arguments pertaining to the jury instructions and sees no reason to rule differently than it did at trial.

C.

The court's post-trial inquiry on compensatory damages relates to whether the award of $210,000 is "monstrously excessive, a product of passion and prejudice, or if there is no rational connection between it and the evidence." *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989).  Callahan suffered physical and emotional effects from his transfer to a position the defendants knew he did not want.[9]  Callahan, and others, perceived the transfer as punishment for speaking out, and the jury apparently agreed**.**  In *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004), the court considered a compensatory award for primarily emotional damages.  It did not find the compensatory damage award to lack a rational connection to the evidence.  "[The plaintiff] testified and the jury was entitled to believe that she experienced nontrivial symptoms of anxiety and other forms of emotional distress . . . . [The plaintiff's] reactions may have been abnormal, but the tortfeasor takes his victim as he finds him . . ." *(citing Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1993); *Tompkins v. Cyr*, 202 F.3d 770, 780 (5th Cir. 2000); *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1294-95 (8th Cir. 1997)).

D.

As noted at the outset, the jury awarded Callahan punitive damages in the amount of $195,600 against Carper and $276,700 against Fermon.  The post trial motions raise the question of the reasonableness of those awards.  *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 18, 18-20 (1991).  The jury was instructed that the purpose of punitive damages was to punish a defendant for his or her conduct and to deter others from engaging in similar conduct in the future.  The jury was told to consider the factors that are described in *Pacific Mut. Life Ins. Co.,* 499 U.S. at 18-20 and *TXO Prod. Corp v. Alliance Res. Corp.,* 509 U.S. 443, 460 (1993), in determining what amount to award.  *See also Mathias v. Accor Econ. Lodging, Inc*., 347 F.3d 672, 676-77 (7th Cir. 2003); *Price v. Highland Cmty. Bank*, 932 F.2d 601, 603-605 (7th Cir. 1991).

---

[8] There was no indication that Callahan recklessly disregarded the truth.  Greg Dixon and Nate Williams had the same concerns about Fermon and urged Callahan to report Fermon's conduct to DII.

[9] Capt. John Strohl had previously told Carper that Callahan was not interested in a transfer to patrol.

The compensatory damages of $210,000 have a rational connection to the evidence; but the punitive damages against Carper equal 93% of the compensatory award and 132% of that award against Fermon.  The court concludes that, even considering the jury's probable outrage at the defendants' conduct in discharging their governmental responsibilities in the investigation and prosecution of criminal cases, the punitive damages are excessive and not reasonable.

The purpose of exemplary damages is to punish and deter, not to destroy.  Carper and Fermon are police officers, They are not corporate executive officers.  The court knows from the record, but the jury was not aware and it was not argued to them, that the defendant Carper's annual salary is $115,000 and Fermon's is $104,236.  The court finds that, considering all the factors outlined in the court's jury instructions, a reasonable punitive damage award against Carper would have been $50,000 and against Fermon would have been $100,000.  That reflects the comparative reprehensibility of the defendants that must have weighed with the jury and serves to punish the defendants but not to destroy them.   Accordingly, a remittitur will be ordered.

Fermon's motion for a new trial [#103] and Carper's motion for a new trial [#104] are denied. The motions to alter or amend judgment [#103, #104], to the extent they seek a remittitur of the punitive damages awards, are granted as follows: the punitive damage award against Carper is reduced to $50,000 and the punitive damage award against Fermon is reduced to $100,000.

III.

Also before the court is Brueggemann's motion for a bill of costs [#117].  He seeks reimbursement for deposition costs, trial transcripts, and exemplars used at trial, totaling $7,483.98. There is no indication that Brueggemann personally must pay the cost of his defense.  Moreover, "a defendant in a civil rights suit can obtain an award of fees only if the suit is adjudged frivolous[.]" *Vukadinovich v. McCarthy*, 59 F.3d 58, 61 (7th Cir. 1995) (*citing Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223, 227-28 (7th Cir.1995)).  Callahan proved a prima facie case against Brueggemann.  A suit is not frivolous simply because the jury finds in favor of the defendant, and to award fees and expenses to the prevailing defendant in a non-frivolous case would have a chilling effect on the filing of civil rights cases in general.  The fee shifting provision is meant to "encourage the filing of meritorious civil rights suits." *Vukadinovich*, 59 F.3d at 61.  Consequently, Brueggemann's motion for a bill of costs [#117] is denied in its entirety.

CONCLUSION

For the foregoing reasons, Fermon's motion for judgment as a matter of law [#101] is denied. Fermon's motion for a new trial [#103] is denied.  Fermon's motion to alter or amend judgment [#103] is granted; the punitive award is reduced to $100,000 and a remittitur of $176,700 is ordered as to Fermon. If the plaintiff fails to accept the remittitur within twenty-one (21) days of this order, then a new trial as to punitive damages only against Fermon is granted.  Carper's motion for judgment as a matter of law [#106] is denied. Carper's motion for a new trial [#104] is denied.  Carper's motion to alter or amend judgment [#104] is granted; the punitive damage award is reduced to $50,000 and a remittitur of $145,600 is ordered as to Carper.  If the plaintiff fails to accept the remittitur within twenty-one (21) days of this order, then a new trial as to punitive damages only against Carper is granted**.**  Callahan's motion for attorney fees and costs [#108] remains pending.  Pursuant to the court's May 31, 2005 order, Callahan shall submit a supplemental petition for fees and costs within

twenty-one (21) days of the date of this order, and the defendants may file a response within fourteen (14) days thereafter.  Brueggemann's motion for a bill of costs [#117] is denied in its entirety.

The clerk is directed to enter judgment in accordance with this order and memorandum opinion.

Entered this 12th day of October, 2005.

**s/Harold A. Baker**

_____

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE